# UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| *In re*: | ) | Case No. 09-73717-FJS |
| | ) | |
| Charles D. Hadley, III, | ) | |
| Janet M. Hadley, | ) | |
| | ) | |
| *Debtors.* | ) | Chapter 13 |
| | ) | |
| Textron Financial Corp., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Charles D. Hadley, III, | ) | |
| | ) | |
| *Defendant.* | ) | APN: 10-07053-FJS |

## MEMORANDUM OPINION

This matter comes before the Court upon trial of the above-captioned Adversary

Proceeding. The Court has subject-matter jurisdiction over this proceeding pursuant to 28

U.S.C. §§ 1334(b) and 157(a) and the General Order of Reference from the United States District

Court for the Eastern District of Virginia, dated August 15, 1984. This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper pursuant to 28 U.S.C. §§

1408(1) and 1409(a). Upon consideration of the pleadings, the evidence presented at trial, and

the arguments of the parties, the Court makes the following findings of fact and conclusions of

law pursuant to Federal Rule of Bankruptcy Procedure 7052. As stated below, the Court grants

Plaintiff's § 523(a)(4) count and denies without prejudice Plaintiff's § 523(a)(6) count; the Court

previously dismissed Plaintiff's § 523(a)(2) count.

## I. BACKGROUND

### A. The Debtors' Chapter 13 Case

On September 8, 2009, Charles D. Hadley, III (the "Defendant" or "Hadley") and Janet

M. Hadley (collectively, the "Debtors") filed, as joint-debtors, a voluntary petition for relief

pursuant to Chapter 13 of Title 11 of the United States Code (the "Code"). (Case No. 09-73717-

FJS, Doc. No. 1.) On September 14, 2009, the Debtors filed their first Chapter 13 Plan. (Case

No. 09-73717-FJS, Doc. No. 12.) The Debtors filed an Amended Plan on January 29, 2010.

(Case No. 09-73717-FJS, Doc. No. 33.) Ultimately, the Debtors filed a Second Amended Plan

on April 19, 2010 and a Third Amended Plan on July 8, 2010. (Case No. 09-73717-FJS, Doc.

Nos. 62, 81.) On August 3, 2010, the Chapter 13 Standing Trustee filed an Objection to

Confirmation of the Debtors' Third Amended Plan, citing failure to make a lump sum payment

required under the terms of the Plan.[1] (Case No. 09-73717-FJS, Doc. No. 90.) Subsequently, on

November 16, 2010, the Chapter 13 Standing Trustee filed a Motion to Dismiss the Case for

failure to make plan payments because the Debtors were five months in arrears on their Chapter

13 Plan (the "Motion to Dismiss"). (Case No. 09-73717-FJS, Doc. No. 96.) On January 6, 2011,

the Court entered an Order settling the Motion to Dismiss. (Case No. 09-73717-FJS, Doc. No.

98.) The Debtors' Chapter 13 plan has yet to be confirmed by Order of the Court.[2]

---

[1] The Chapter 13 Standing Trustee's Objection to Confirmation also states that the "Trustee has a pending Motion to Dismiss based on eligibility . . . [that] has been continued generally until the debtors' Objection to Padgett's Claim and Complaint to Determine Dischargeability and to Deny Discharge have been resolved." (Case No. 09-73717-FJS, Doc. No. 90.)

[2] On April 11, 2011, Counsel for the Debtors filed an Application for Compensation. (Case No. 09-73717-FJS, Doc. No. 100.) On May 24, 2011, the Court held a hearing on the Application for Compensation and continued the matter until resolution of the adversary proceedings filed against Defendant. (Case No. 09-73717-FJS, Doc. No. 106.)

2

## B. Factual History

The instant matter is one of three pending adversary proceedings filed against Defendant. On December 14, 2009, Reginald J. Padgett ("Padgett") filed suit against Defendant seeking a determination of nondischargeability as to certain debts pursuant to §§ 523(a)(2)(A) and 523(a)(4) of the Code. (APN 09-07140, Doc. No. 1.)[3] On December 14, 2009, Direct Capital Group, LLC ("DCG") sued the Debtors seeking a determination of nondischargeability as to certain debts pursuant to §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Code. (APN 09-07141, Doc. No. 1.) DCG also sought a denial of the Debtors' discharge pursuant to § 727 of the Code. Lastly, on April 19, 2010, Textron Financial Corporation (the "Plaintiff" or "TFC") commenced the instant matter by suing Defendant, seeking a determination of nondischargeability as to certain debts pursuant to §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Code. (APN Doc. No. 1.) The Court will issue separate Orders and Memorandum Opinions in each adversary proceeding.

The facts of each adversary proceeding arise out of the same circumstances. Atlantic Golf Cart and Equipment, Inc. ("Atlantic Golf") is a corporation registered with the State Corporation Commission for the Commonwealth of Virginia, and its principal business purposes were (1) to sell new and used golf carts, (2) repair and service golf carts, and (3) lease golf carts. Plaintiff's and DCG's allegations center around the fact that golf carts leased or sold to Atlantic Golf disappeared from Atlantic Golf's inventory without the lessor or retailer having been properly compensated, in contravention of existing contracts.

---

[3] All parenthetical references to documents filed in the instant matter—APN 10-07053-FJS—shall be cited as (APN Doc. No. __.), and any reference to documents filed in other adversary proceedings will included the relevant APN number, such as (APN 09-07040 Doc. No. __.).

Defendant has been employed on a full time basis as a firefighter for the City of

Chesapeake since 1984. (APN 09-07141-FJS, Pl.'s Ex. 11 at 7:17-20.) Defendant has been an

officer and stockholder in Atlantic Golf since its inception in 1990. (APN 09-07141-FJS, Pl.'s

Ex. 11 at 10:5-6.) Defendant served as vice president of Atlantic Golf between 1991 and 1998.

Defendant became president of Atlantic Golf in 1998. (APN 09-07141-FJS, Pl.'s Ex. 11 at 9:17-

18, 9:24-10:2.) Until October 31, 2001, Defendant held 50% of Atlantic Golf's stock. (APN 09-

07141-FJS, Pl.'s Ex. 11 at 9:10-10:23.) Padgett held 50% of Atlantic Golf's stock up until

October 31, 2001, when Padgett sold his 50% interest in Atlantic Golf to Defendant. (APN 09-

07140-FJS, Doc. No. 1, ¶ 7.)

Plaintiff is a publicly-traded Delaware corporation with its headquarters in Providence,

Rhode Island. Plaintiff operates as a finance company that provides financing programs for

products manufactured by third parties, as well as its corporate parent, Textron, Inc., including

golf course maintenance equipment and golf carts. (Compl. ¶ 4.) Plaintiff financed Atlantic

Golf's purchase of golf carts from E-Z-Go by purchasing inventory from E-Z-Go and then

leasing the inventory directly to Atlantic Golf. (Pl.'s Ex. 11, at 9:4-7.)

**1. The January 2001 Loan Agreement And Guaranty**

On January 9, 2001, TFC and Atlantic Golf executed a Finance Plan (the "Finance

Plan"). (Pl.'s Trial Ex. 1.) The Finance Plan set forth the terms by which an item sold to

Atlantic Golf would be eligible for financing by TFC, including principal and interest payment

obligations. The Finance Plan also afforded TFC the right to audit periodically the inventory of

items financed by TFC in the possession of Atlantic Golf. (Pl.'s Trial Ex. 1.)

On January 9, 2001, TFC and Atlantic Golf executed a Wholesale Security Agreement

(the "Wholesale Security Agreement"). The Wholesale Security Agreement granted to TFC a

4

security interest in collateral—including golf carts and utility vehicles—in the possession of

Atlantic Golf.[4]  The Wholesale Security Agreement also sets forth events of default.  Section

9(c) states that Atlantic Golf will be in default if it disposes of the collateral in any manner not in

compliance with Section 7 of the Agreement.  Section 7 states that Atlantic Golf "may sell any

item of Collateral PROVIDED THAT: (a) [Atlantic Golf] is not in default hereunder, (b) the

price obtained for such item of Collateral is not less than the unpaid Total Debt attributable

thereto, and *(c) [Atlantic Golf] holds all of the proceeds of any such sale in trust for, and*

*promptly remits the unpaid Invoice Cost of such item of Collateral to, [TFC].*"  (Pl.'s Trial Ex.

2, at 3 (emphasis added).)

On January 9, 2001, Defendant executed, and delivered to TFC, a personal Guaranty (the

"Guaranty") of the debts of Atlantic Golf.  (Pl.'s Trial Ex. 3.)  In relevant part, the Guaranty

states that Defendant

> unconditionally and irrevocably guarantees to [TFC] . . . without off-set or
> deduction, the prompt payment and/or performance of all indebtedness,
> obligations, and liabilities of Obligor at any time owing to [TFC], whether direct
> or indirect, matured or unmatured, primary or secondary, certain or contingent or
> acquired or created by [TFC] . . . .

(Pl.'s Trial Ex. 3, at 1.)  The Guaranty is "governed by, and contrued [*sic*] in accordance with,

the laws of the state of Rhode Island, without reference to applicable conflict of law principles."

---

[4] Exhibit A to the Wholesale Security Agreement describes the Collateral in full:

> All equipment and inventory, wherever located, in which [Atlantic Golf] now or hereafter has
> rights, financed or refinanced by [TFC] for [Atlantic Golf], including but not limited to golf cars
> [*sic*] and utility vehicles; all present and future attachments, accessories and accessions thereto; all
> spare parts, replacements, substitutions and exchanges therefore; all trade-ins relating thereto; all
> instruments, accounts and chattel paper arising therefrom (including leases and conditional sales
> contracts); and the proceeds of all of the foregoing, including proceeds in the form of goods,
> accounts, chattel paper, documents, instruments and/or general intangibles.

(Pl.'s Trial Ex. 2, at Ex. A.)  Defendant accepted and signed Exhibit A to the Wholesale Security Agreement.  On or
before October 31, 2005, TFC caused to be filed with the Virginia State Corporation Commission a UCC Financing
Statement Amendment on FORM UCC3 concerning its interest in the Collateral described above. (Pl's Trial Ex. 4.)

(Pl.'s Trial Ex. 3, at 2.)

### 2. *Atlantic Golf's Default*

While the record of facts between January 2001 and September 2008 is sparse, it is

apparent that between 2001 and early 2008 TFC and Atlantic Golf operated pursuant to the terms

of the January 2001 loan and security agreements without incident.  During discovery in the state

court proceeding—described in more detail below—in the Circuit Court for the City of

Chesapeake, Plaintiff deposed Defendant on May 11, 2009.  (Pl.'s Trial Ex. 11.)  Defendant

testified that in September 2008 members of his staff at Atlantic Golf notified him that certain

golf carts were "sold and unpaids."  (Pl's Trial Ex. 11, at 39:8-9.)  Defendant explained that a

"sold and unpaid" is a "vehicle that has been sold and it has not been paid for and is no longer on

the premises."  (Pl.'s Trial Ex. 11, at 38:20-23.)  Defendant further explained that—in the

ordinary course of business—when Atlantic Golf sold a golf cart, the inventory was removed

from the Atlantic Golf lot in exchange for the customer paying for the golf cart with cash, credit

card, or on account financing.  (Pl.'s Trial Ex. 11, at 40:7-17.)  Defendant stated "that money is

specifically supposed to be ear marked for the payment of that vehicle . . . [to] Textron

Financial."  (Pl.'s Trial Ex. 11, at 40:20-23.)  "You're saying in some situations that wasn't done

right?  Evidently, yes, sir."  (Pl.'s Trial Ex. 11, at 40:24-41:1.)  Defendant further testified at his

deposition that he did not know how many golf carts had been sold, or otherwise disposed of,

without proceeds having been earmarked for the given sale.  (Pl.'s Trial Ex. 11, at 41:2-9.)

On September 25, 2008, TFC sent to Atlantic Golf a document entitled Voluntary

Release and Surrender (the "Release"), wherein Atlantic Golf "release[d] and surrender[ed]

possession of all inventory financed by [TFC]."  (Pl.'s Trial Ex. 5.)  Defendant, as president,

signed the Release on behalf of Atlantic Golf on September 30, 2008.  The Release attached as

6

Exhibit 1 an itemized list of inventory items financed by Plaintiff and the balance due on those items. Handwritten notes, initialed by the parties, on the Release indicate that Atlantic Golf would use "best reasonable efforts to ensure that the items in Exhibit 1 will be in a marketable and merchantable condition" and that none of those items would be "sold or otherwise disposed of prior to the surrender." (Pl.'s Trial Ex. 5.)

Plaintiff later sold the remaining golf carts then held by Atlantic Golf. The sale failed to cure the defaulted obligations of Atlantic Golf, and Textron alleged that no less than $157,494.00 of its collateral was missing. (Compl. ¶¶ 27-29.) Plaintiff alleges that Defendant attempted to conceal the missing golf carts by switching serial numbers from sold inventory to unsold inventory, thereby hiding the fact that the golf carts were no longer in the possession of Atlantic Golf. (Compl. ¶¶ 31-34.)

### 3. The State Court Action

In October 2008, TFC filed a complaint in the Circuit Court for the City of Chesapeake, Virginia against Atlantic Golf, Hadley, and Padgett. (Compl. ¶ 13; Case No. CL09-210, the "State Court Action".) The State Court Action was assigned to the Honorable Randall D. Smith. Ultimately, in the State Court Action, that Court, by Order dated July 22, 2009, rendered judgment in favor of the plaintiff, TFC, against defendants Atlantic Golf and Hadley (the "State Court Judgment"). (APN Doc. No. 1-1, Ex. 7.) The State Court Judgment awarded (1) compensatory damages of $193,196.24 to TFC; (2) accrued interest to TFC; (3) costs to TFC; and (4) attorneys' fees in the amount of $20,500.00 to TFC. "Nothing [in the] Order precludes or prejudices Textron Financial Corporation from pursuing its rights and remedies against the remaining defendant Reginald J. Padgett." (APN Doc. No. 1-1, Ex. 7.)

On August 26, 2009, Padgett and TFC reached a settlement in the State Court Action.

7

(APN 09-07140-FJS, Doc. No. 1-4, Ex. 2.) TFC and Padgett agreed to enter into a mutual

release and the dismissal with prejudice of all pending litigation against Padgett (the "Settlement

Agreement"). Pursuant to the Settlement Agreement, Padgett paid TFC $37,500.00. In

exchange for the payment of $37,500.00, TFC assigned to Padgett all rights and remedies of TFC

for the enforcement and collection of the amount or amounts paid. (APN 09-07140-FJS, Doc.

No. 1-4, Ex. 2.) As a result of the settlement between Padgett and TFC, TFC has applied a credit

in the amount of $37,500 to the State Court Judgment. (APN 09-07140-FJS, Compl. ¶¶ 35-39.)

## II. PROCEDURAL HISTORY

### A. TFC's Complaint

On April 19, 2010, TFC filed its Complaint against Defendant pursuant to 11 U.S.C. §

523, wherein TFC sought to determine the dischargeability of debt owed to it by Defendant (the

"Complaint").[5] (APN Doc. No. 1.) TFC seeks a declaration from the Court that Defendants's

debts owed to Textron ought not to be discharged pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4),

and (a)(6). (Compl. ¶ 1.) At trial, the Court dismissed the § 523(a)(2) count against Defendant

because Plaintiff was not able to produce at trial evidence or testimony that would support the §

523(a)(2) count. (APN Doc. No. 16; APN Doc. No. 20, at 19:17-20:6.) The Court will not

further address that count of the Complaint in this Memorandum Opinion.

The Complaint alleges that Defendant's debt to TFC is nondischargeable under §

523(a)(4) because it is a debt "for fraud or defalcation while acting in a fiduciary capacity,

---

[5] TFC filed timely on December 2, 2009, in the Debtors' Main Chapter 13 Case, a Motion for Extension of Time for Filing of Complaint for Determination of Dischargeability of Debt. (Case No. 09-73717-FJS, Doc. No. 19.) On January 8, 2010, the Court extended the deadline by which to file such a complaint as to Defendant to March 14, 2010. (Case No. 09-73717-FJS, Doc. No. 27.) Again, TFC filed timely on February 18, 2010, in the Debtors' Main Chapter 13 Case, a Motion for Extension of Time for Filing of Complaint for Determination of Dischargeability of Debt. (Case No. 09-73717-FJS, Doc. No. 35.) On March 30, 2010, the Court granted the second extension, setting a deadline to file the Complaint as April 19, 2010. (Case No. 09-73717-FJS, Doc. No. 53.)

embezzlement, or larceny." 11 U.S.C. § 523(a)(4) (2006). TFC alleges that it and Defendant were in a fiduciary relationship as a result of the January 2001 agreements and guaranty executed between the parties. And, due to Defendant's conduct in concealing the serial numbers on golf carts, Defendant defrauded TFC. Thus, the debt owed pursuant to the State Court Judgment is nondischargeable. (Compl. ¶¶ 60-71.)

The Complaint further alleges that Defendant's debt to TFC is non-dischargeable under § 523(a)(6) because it is a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (2006). TFC alleges that Defendant "converted, misappropriated, removed, or possessed" funds due to it pursuant to the parties' agreements. (Compl. ¶¶ 72-81.) TFC alleges that the aforementioned acts by Defendant were "done willfully, deliberately, intentionally and with knowing disregard for [TFC's] rights." (Compl. ¶ 77.) TFC, thus, argues that the debt owed pursuant to the State Court Judgment is nondischargeable due to Defendant's willful and malicious injuries to Plaintiff.

### B. The Defendant's Response

On May 26, 2010, Defendant filed an Answer to the Complaint. (APN Doc. No. 6.) Defendant denied that he owed a fiduciary duty to TFC. (Answer ¶ 15.) Defendant stated that, in regards to disposition of the funds or golf carts that may be deemed property of TC, "he had no knowledge of such disposition, nor did he benefit any way from said disposition; thus, he has no vicarious liability therefore." (Answer ¶ 17.) Finally, Defendant stated that in the event that the Complaint was upheld (i) his Chapter 13 Plan would provide for full or partial payment of the debt owed to TFC; and (ii) that only that portion of TFC's claim *not* included in the Chapter 13 Plan may be deemed dischargeable. (Answer ¶ 18.)

## C. Trial

On August 11, 2010, the Court held a trial at which it heard evidence related to this matter, as well as the other two pending adversary complaints against Hadley. (Case No. 10-07053-FJS; Doc. No. 20; Trial Tr.) At trial, the Court dismissed with prejudice the § 523(a)(2) count against Hadley. (APN Doc. No. 16.)   Further, the Court ruled that TFC satisfied its initial burden on the § 523(a)(4) count, and that the burden rests on Defendant to "demonstrate whether or not [Hadley] was personally responsible for the conduct that gave rise to the breach" that constitutes the basis of the § 523(a)(4) count. (Trial Tr. at 43:2-10.) After trial, the parties supplemented their arguments with post-trial briefs, and the Court conducted a status hearing on October 26, 2010. (APN Doc. No. 25.)

## III. ANALYSIS

As stated below, the Court grants Plaintiff's § 523(a)(4) count and deems the debt owed by *Defendant to Plaintiff nondischargeable for Defendant's defalcation while acting in a* fiduciary capacity.  The Court denies without prejudice Plaintiff's § 523(a)(6) count.[6]

### A. The § 523(a)(4) Count Is Upheld

Section 523(a)(4) of the Code holds that "[a] discharge under section . . . 1328(b) of this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Thus, § 523(a)(4) concerns three types of debts: (1) debts arising from fraud or defalcation while acting in a fiduciary capacity; (2) debts arising from embezzlement; and (3) debts arising from larceny.

---

[6] The Court declines to afford a preclusive effect via collateral estoppel to the State Court Judgment. The Court cannot discern with certainty what precise issues were actually litigated in the State Court Action and whether those issues were essential to the State Court Judgment, as required to apply collateral estoppel. *See Viener v. Jacobs (In re Jacobs)*, 381 B.R. 128, 144 (Bankr. E.D. Pa. 2008); *see also* 4 Collier on Bankruptcy ¶ 523.12[5] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. Rev. 2010).

*Id.* In this case, the Court will only consider the fraud or defalcation in a fiduciary capacity allegation because it finds that Defendant did commit an act of defalcation while acting in a fiduciary capacity.

## 1. Burden of Proof

"At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." Fed. R. Bankr. P. 4005. The Advisory Committee Notes to Rule 4005 state that "the rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence . . . ." Fed. R. Bankr. P. 4005 advisory committee's note. In the Eastern District of Virginia, "the plaintiff has the burden of proof to render a debt nondischargeable. Under § 523(a), the plaintiff must prove nondischargeability by a preponderance of the evidence." *KMK Factoring, L.L.C. v. McKnew, (In re McKnew)*, 270 B.R. 593, 617 (Bankr. E.D. Va. 2001) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Farouki v. Emirates Bank Int'l, Ltd. (In re Farouki)*, 14 F.3d 244, 249 (4th Cir. 1994)); *see also OSB Mfg v. Hathaway (In re Hathaway)*, 364 B.R. 220, 234 (Bankr. E.D. Va. 2007); *Elrod v. Bowden (In re Bowden)*, 326 B.R. 62, 86 (Bankr. E.D. Va. 2005) (citing *Parker v. Grant (In re Grant)*, 237 B.R. 97, 115 (Bankr. E.D. Va. 1999)).

## 2. Fraud Or Defalcation While Acting In A Fiduciary Capacity

"To prevail under [§ 523(a)(4)] a creditor must ordinarily make a two-part showing: (1) that the debt in issue arose while the debtor was acting in a fiduciary capacity; and (2) that the debt arose from the debtor's fraud or defalcation." *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497 (4th Cir. 2008) (citing *Pahlavi v. Ansari (In re Ansari)*, 113 F.3d 17, 20 (4th Cir. 1997)). Citing *Airlines Reporting Corp. v. Ellison (In re Ellison)*, 296 F.3d 266 (4th Cir. 2002), the *Strack* court named four relevant factors: "(1) the debtors personally guaranteed

11

the indebtedness; (2) the indebtedness arose due to defalcation or 'the breach of a fiduciary

relationship between the two corporations'; (3) the debtors 'were personally responsible for the

conduct that gave rise' to their corporation's breach or defalcation; and (4) the debtors' 'conduct

amount[s] to a breach of their fiduciary duty' to their corporation." *In re Strack*, 524 F.3d at 500

(quoting *In re Ellison*, 296 F.3d at 270-71).

More recently, Chief Judge Tice expounded upon the Fourth Circuit's ruling in *Strack*.

*Halstead v. Bilter (In re Bilter)*, 413 B.R. 290, 304-07 (Bankr. E.D. Va. 2009).

> The court must first determine whether [the debtor] owed a fiduciary duty to
> plaintiff. While federal law determines whether a fiduciary duty exists under §
> 523(a)(4), in making that determination, the bankruptcy court may refer to state
> law . . . we look to the law of . . . where the trust was allegedly created for
> guidance.

*In re Bilter*, 413 B.R. at 304 (citing *In re Strack*, 524 F.3d at 498; *Davis v. Aetna Acceptance*

*Co.*, 293 U.S. 328, 334 (1934)). "The second element of § 523(a)(4) is that the debtor fiduciary

must have committed a defalcation. Defalcation is defined as 'the slightest misconduct, and it

need not be intentional conduct; negligence or ignorance may be defalcation.'" *In re Bilter*, 413

B.R. at 307 (quoting *Bailey v. Sonnier (In re Sonnier)*, 157 B.R. 976, 984 (E.D. La. 1993)

(quoting *Morales v. Codias (In re Codias)*, 78 B.R. 344, 346 (Bankr. S.D. Fla. 1987))). In the

Fourth Circuit, "[a] defalcation' . . . does not have to rise to the level of 'fraud,' 'embezzlement,'

or even 'misappropriation.'" *In re Ansari*, 113 F.3d at 20. "A defalcation under § 523(a)(4) is

the 'misappropriation of trust funds or money held in any fiduciary capacity; *[or the] failure to*

*properly account for such funds*.'" *Id.* (emphasis added).

### a. Hadley Guaranteed The Indebtedness Of Atlantic Golf

The first factor that the *Strack* court names is that the "debtor[] personally guaranteed the

indebtedness." *In re Strack*, 524 F.3d at 500. In this case, there is no doubt that Defendant

personally guaranteed the indebtedness of Atlantic Golf to TFC. The Guaranty executed

between TFC and Defendant on January 9, 2001 speaks for itself. (Pl.'s Trial Ex. 3.) Hadley

"unconditionally and irrevocably guarantee[d] to [TFC] . . . the prompt payment and/or

performance of all indebtedness, obligations, and liabilities of [Atlantic Golf] at any time owing

to [TFC], whether direct or indirect, matured or unmatured, primary or secondary, certain or

contingent or acquired or created by [TFC]." (Pl.'s Trial Ex. 3.) At trial, the Guaranty was

admitted to evidence, as stipulated by the parties in their pretrial Stipulation of Facts. (Trial Tr.

at 41:18-19; Stip. of Facts ¶ 7.)

Under the terms of the Guaranty, Defendant intended to guaranty, in his personal

capacity, the indebtedness that Atlantic Golf then owed or later incurred to TFC. Defendant

signed the document as an "Individual Guarantor(s)" and the address provided by Defendant was

his residential, home address. (Pl.'s Trial Ex. 3; Pl.'s Trial Ex. 11, at 22:19-23:17.) Therefore,

the first *Strack* factor is satisfied; Defendant guaranteed personally Atlantic Golf's indebtedness

to TFC.

### b. Atlantic Golf Breached Its Fiduciary Relationship With TFC

The Court finds that (i) a fiduciary relationship existed between Atlantic Golf and TFC,

and that (ii) Atlantic Golf breached its duties under that relationship by failing to hold and remit

all the proceeds of sales of the collateral to TFC. Pursuant to § 7(c) of the Wholesale Security

Agreement, Atlantic Golf held "all of the proceeds of any such sale in trust for . . . [TFC]." (Pl.'s

Trial Ex. 2, at 2.)

As Chief Judge Tice noted in the *Bilter* decision, courts must "look to the law of . . .

where the trust was allegedly created for guidance." *In re Bilter*, 413 B.R. at 304-07. Section 13

of the Wholesale Security Agreement states that the Agreement shall be governed by and

13

construed in accordance with Rhode Island law. (Pl.'s Trial Ex. 2 ,at 3.) Thus, Rhode Island law

determines whether the Wholesale Security Agreement created a trustee-beneficiary relationship

between Atlantic Golf and TFC. Furthermore, the contours of § 523(a)(4) define narrowly the

meaning of a fiduciary, such that *only* as a result of an express trust will the Court deem a trustee

to owe fiduciary duties to the purported beneficiary. *See In re Strack*, 524 B.R. F.3d at 497 n.6

(quoting *E.L. Hamm & Assocs. v. Sparrow (In re Sparrow)*, 306 B.R. 812, 828 (Bankr. E.D. Va.

2008)) (citing *Harrell v. Merchant's Express Money Order Co. (In re Harrell)*, 173 F.3d 850,

1999 WL 150278, at *3 (4th Cir. 1999) (unpublished table decision); *Davis*, 293 U.S. at 333-34).

        "A trust is an obligation arising out of a confidence reposed in a person, for the benefit of

another, to apply property faithfully and according to such confidence." *Desnoyers v.*

*Metropolitan Life Ins.*, 272 A.2d 683, 688 (R.I. 1971) ("A person who alleges a voluntary

express trust in personalty, title to which is held by another, must prove such trust by clear and

convincing evidence."); *see also Concannon v. Concannon*, 356 A.2d 487, 491 n.2 (R.I. 1976)

("Express trusts are those which are created by the direct and positive acts of the parties, by some

writing, or deed, or will, or by words either expressly or impliedly evincing an intention to create

a trust. 89 C.J.S. *Trusts* § 11 (1955)."). "The elements of an express trust include: (1) a clear

declaration of the creation of a trust; (2) a plainly defined trust res; and (3) the intent to create a

trust relationship." *Am. Title Ins. Co. v. Marderosian (In re Marderosian)*, 186 B.R. 341, 346

(Bankr. D. R.I. 1995) (citing *R.I. Lottery Comm'n v. Cairone (In re Cairone)*, 12 B.R. 60, 62

(Bankr. D. R.I. 1981)); *see also Beauchaine v. Beauchaine (In re Beauchaine)*, 113 B.R. 116-17

(Bankr. D. R.I. 1990).

        Under Rhode Island law, the Wholesale Security Agreement between Atlantic Golf and

TFC created a trust relationship by which Atlantic Golf owed fiduciary duties to TFC. First,

there exists a clear declaration of a trust evidenced by the words in the Wholesale Security

Agreement itself. Atlantic Golf held "all of the proceeds of any such sale in trust for . . . [TFC]."

(Pl.'s Trial Ex. 2, at 2.) Second, the proceeds that flowed from the sales of collateral—golf carts

and other equipment—constituted the trust res. Finally, the parties intended to create a trust

relationship because the parties signed the Wholesale Security Agreement, and no allegations of

duress or other suggestions that the parties were not on equal footing during negotiations were

made. The Wholesale Security Agreement creates unequivocally an express trust between

Atlantic Golf and TFC. Therefore, it necessarily follows that Atlantic Golf owed fiduciary duties

to TFC. *See In re Cairone*, 12 B.R. at 62 (citing *Davis*, 293 U.S. at 333-34).

Once a fiduciary relationship has been established, the Court must find that Atlantic Golf

breached its duties under that relationship. Here, the express trust between Atlantic Golf and

TFC required that Atlantic Golf "hold[] all of the ***proceeds of any such sale in trust*** for, and

promptly remit[] the unpaid Invoice Cost of such item of Collateral to[ TFC]." (Pl.'s Trial Ex. 2,

at 3 (emphasis added).) Atlantic Golf breached its duty to TFC when—after disposing of TFC's

collateral—the proceeds of those dispositions were not remitted to TFC. "[T]he proper focus is

on the *proceeds* from the sale of the chattel." *In re Strack*, 524 B.R. F.3d at 499. Per the

Wholesale Security Agreement, Atlantic Golf was "***not*** entitled to treat the proceeds as its own

and use them as it wished." *Id.* at 500 (emphasis added). The proceeds from the sale of golf

carts and equipment were the property of TFC, and Atlantic Golf did not have unfettered use of

funds owed, if any, resulting from the sale, lease, or other disposition of the collateral. Atlantic

Golf, thus, breached its fiduciary duties by failing to account for the proceeds from the

dispositions of TFC's collateral.

15

### c. Defendant Was Personally Responsible For Atlantic Golf's Defalcation

TFC "must demonstrate not only that [Atlantic Golf] defalcated while acting in a

fiduciary capacity for [TFC], but also that [Atlantic Golf's] actions can be attributed to

[Hadley]." *In re Strack*, 524 F.3d at 498 (citing *In re Ellison*, 296 F.3d at 270-71). The Fourth

Circuit, in *Strack*, did "not labor long over this issue," and the facts before the Court are so

similar to *Strack* that extensive analysis is unnecessary. *In re Strack*, 524 F.3d at 500. In both

cases, the debtor's corporate entity entered into an express trust agreement with another

corporate entity. *Id.* In both cases, the debtor personally guaranteed the indebtedness on behalf

of his corporate entity. *Id.* In both cases, the debtor's corporate entity "breached the trust

agreement and amassed a significant debt." *Id.*

Atlantic Golf entered into an express trust agreement with TFC. Defendant guaranteed

personally the indebtedness on behalf of Atlantic Golf. Lastly, Atlantic Golf breached the trust

agreement by selling, leasing, or otherwise disposing of TFC's collateral without remitting the

proceeds of those dispositions to TFC. Further, not only did Defendant guaranty payment on

behalf of Atlantic Golf to TFC, Defendant guaranteed performance on behalf of Atlantic Golf.

Defendant guaranteed "the prompt payment and/or performance of all indebtedness, obligations,

and liabilities of [Atlantic Golf] at any time owing to [TFC], whether direct or indirect, matured

or unmatured, primary or secondary, certain or contingent or acquired or created by" TFC. (Pl.'s

Trial Ex. 3, at 1.) By guaranteeing payment *and* performance on behalf of Atlantic Golf,

Defendant agreed that he was personally responsible for the debts, obligations, and liabilities of

Atlantic Golf owed to TFC. *See Ingram Micro Inc. v. ABC Mgmt. Tech. Solutions, LLC*, 746 F.

16

Supp. 2d 765, 770 (E.D. Va. 2010).[7] Defendant not only guaranteed that Atlantic Golf would

pay its debts owed to TFC but also that the proceeds generated from the sale or lease of TFC's

collateral would remain held in trust for the benefit of TFC.  Atlantic Golf failed to fulfill both

the obligation of payment and the obligation of performance.

### d. Defendant's Conduct Was A Breach Of His Fiduciary Duties To Atlantic Golf

In failing to monitor properly the affairs and accounts of Atlantic Golf, Defendant

breached his fiduciary duties as an officer and a controlling shareholder of Atlantic Golf.  As a

result of Defendant's relationship and position with Atlantic Golf—as president and sole

shareholder—the Court need not labor long over this element.  The Court finds persuasive the

reasoning stated by the United States Bankruptcy Court for the Southern District of Florida:

> Several cases have held that a fiduciary relation may exist between the corporate
> officers and the creditors in the presence of a contractual agreement establishing a
> trust relationship with the corporation . . . .  A corporation acts only through its
> officers or employees.  When a corporation as an entity is placed in a fiduciary
> capacity it is the corporate officer who is charged with performing the fiduciary
> duties and living up to the terms of the agency. If the fiduciary relationship is not
> imposed upon the corporate officer charged with maintaining the fiduciary
> relationship, then § 523(a)(4) could be rendered meaningless in cases where the
> fiduciary relationship is established between a creditor and a corporate fiduciary
> only.  All a debtor would have to do to avoid § 523(a)(4) is place the corporation
> in the position as fiduciary rather than himself.  He then could breach the
> fiduciary relationship with impunity.

*In re Koszuth*, 43 B.R. 104, 108 (Bankr. N.D. Fla. 1984).  Courts within this District have

reached the same conclusion, finding that "misappropriation of trust property by a corporate

officer makes the officer liable on a personal basis for the breach of trust."  *Global Express

Money Orders, Inc. v. Davis (In re Davis)*, 262 B.R. 673, 684 (Bankr. E.D. Va. 2001) (citing

---

[7] Furthermore, the controlling shareholder of an officer of a corporation placed in a fiduciary capacity is "charged
with performing the fiduciary duties and living up to the terms of the agency.  If the fiduciary relationship is not
imposed upon the corporate officer charged with maintaining the fiduciary relationship, then § 523(a)(4) could be

*Hodnett v. Loevner (In re Loevner)*, 167 B.R. 824, 826 (Bankr.E.D.Va.1994); *Mostiler v. Couch*

*(In re Couch)*, 100 B.R. 802, 808 (Bankr.E.D.Va.1988); *Bellity v. Wolfington (In re Wolfington)*,

48 B.R. 920, 923 (Bankr.E.D.Pa.1985); *In re Koszuth,* 43 B.R. at 107).

 In this case, Defendant was a controlling and dominating shareholder.  In January 2001,

when Defendant executed the Guaranty, Defendant held 50% of the shares of Atlantic Golf and

served as its president.  By October 31, 2001, Defendant held 100% of the shares of Atlantic

Golf, and he held all of the stock in Atlantic Golf when it defaulted on its obligations to Plaintiff

in summer 2008.  Defendant may claim that he delegated certain roles to employees, thus

mitigating the notion that he ran Atlantic Golf on a daily basis.  That claim, even if true, does not

counter the weight of his proven actions.  Defendant, even in light of full time employment as a

firefighter, devoted 30 to 40 hours per week to Atlantic Golf.  (Pl's Ex. 11, at 5:10-11.)

Defendant stated that, while he did not handle much of the financial details concerning Atlantic

Golf, he "managed the actual . . . watched on a consistent basis -- tried to watch the inventory

that was coming in and going out."  (Pl's Ex. 11, at 28:18-24.)  Defendant, in his capacity as

president, encumbered Atlantic Golf with debt and also borrowed money to pay off the

obligations of Atlantic Golf.  (Pl's Ex. 11, at 48:6-49:15.)

 In the State Court Action, Defendant testified that the proceeds from sales of TFC's

collateral ought to have been earmarked for remittance to TFC; that did not occur.  (Pl.'s Trial

Ex. 11, at 40:20-23.)  Instead, Defendant testified that in certain situations that procedure was not

followed.  Defendant, rather, testified to having no knowledge of where the proceeds went or

even why or how the proceeds were handled.  Defendant testified that an employee of his would

have knowledge of where or how the proceeds were handled.  (Pl.'s Trial Ex. 11, at 41:2-12.)

---

rendered meaningless in cases where the fiduciary relationship is established between a creditor and corporate

Defendant further testified that while he, personally, observed a policy that when collateral was

sold, the proceeds were to be remitted to Plaintiff.  Defendant testified, however, that policy was

not put into writing.  (Pl.'s Trial Ex. 11, at 41:18-24.)  Defendant's failure to monitor the affairs

of Atlantic Golf represents a breach of his fiduciary duties.  Defendant, as President and sole

shareholder, ought to have known of and been in a position to prevent the unauthorized and illicit

disposition of Plaintiff's collateral.  Defendant cannot claim ignorance as an excuse to the

unauthorized and illicit disposition of the collateral and the proceeds of those dispositions.

Therefore, the Court finds as a finding of fact and conclusion of law that Defendant's

debt to Plaintiff is nondischargeable pursuant to § 523(a)(4).  Defendant personally guaranteed

Atlantic Golf's indebtedness to Plaintiff.  That indebtedness arose as a result of a defalcation

between Atlantic Golf and Plaintiff.  Defendant was personally responsible for the conduct that

resulted in and gave rise to Atlantic Golf's breach.  Lastly, Defendant's conduct was a breach of

his fiduciary duty to Atlantic Golf.  Thus, Plaintiff's § 523(a)(4) count is upheld.

### B. The § 523(a)(6) Count Is Dismissed Without Prejudice

Plaintiff's § 523(a)(6) count fails to state a claim upon which relief can be granted.

Section 523(a)(6) cannot afford relief to Plaintiff because the statute is inapplicable at this stage

the Debtors' Chapter 13 Bankruptcy Case.  A debt arising from willful and malicious injury to

property, while nondischargeable in a Chapter 7 case per § 523(a)(6), *is* dischargeable in an

open, pending Chapter 13 case.  The plain language of § 1328, when compared to § 523, makes

that clear, as does the case law interpreting the statute.

### 1. Discharge Pursuant To § 1328

Section 1328 governs a debtor's discharge in a Chapter 13 case.  11 U.S.C. § 1328

---

fiduciary only." *In re Koszuth*, 43 B.R. 104, 108 (Bankr. N.D. Fla. 1984).

(2006). A Chapter 13 debtor may receive a discharge of his allowed debts under two alternate

scenarios. First, a debtor may receive a discharge of allowed debts if the debtor completes all of

the plan payments contemplated by his plan. 11 U.S.C. § 1328(a). Second, a debtor may receive

a discharge of allowed debts if, after confirmation of the plan but before completion of all

payments, the debtor fails to complete the plan payments but that failure is

> (1) due to circumstances for which the debtor should not justly be held
> accountable; (2) the value, as of the effective date of the plan, of property actually
> distributed under the plan on account of each allowed unsecured claim is not less
> than the amount that would have been paid on such claim if the estate of the
> debtor had been liquidated under chapter 7 of this title on such date; and (3)
> modification of the plan under section 1329 of this title is not practicable.

11 U.S.C. § 1328(b). The first alternative, under § 1328(a), is referred to as a "completion of

plan" discharge. The second alternative, under § 1328(b), is commonly referred to as a

"hardship discharge." *See, e.g., In re Minahan*, 394 B.R. 116, 132 (Bankr. W.D. Va. 2008); *In re*

*Awua*, Case No. 96-10613-SSM, 1997 WL 1524900, at *1 (Bankr. E.D. Va. Feb. 24, 1997).

### a. Section 1328(a) Does Not Except From Discharge § 523(a)(6) Debts

Section 1328(a) of the Code states that "as soon as practicable after completion by the

debtor of all payments under the plan . . . unless the court approves a written waiver of discharge

executed by the debtor after the order for relief under this chapter, the court shall grant the debtor

a discharge of all debts provided for by the plan or disallowed under section 502 of this title,

except" four enumerated categories of debts. 11 U.S.C. § 1328(a). Subsection 1328(a)(2)

excepts from a completion of plan discharge debts of the kind specified in § 507(a)(8)(C) or in

§§ 523(a)(1)(B)-(C), 523(a)(2), 523(a)(3), 523(a)(4), 523(a)(5), 523(a)(8), or 523(a)(9.).

Notably, § 523(a)(6) is omitted amidst the other specified subsections of § 523(a) spelled out in §

1328(a)(2). 11 U.S.C. § 1328(a)(2). Section 1328(a)(4) excepts from a completion of plan

discharge debts "for restitution, or damages, awarded in a civil action against the debtor as a

20

result of willful or malicious injury by the debtor that caused *personal injury to an individual or the death of an individual*." 11 U.S.C. § 1328(a)(4) (emphasis added).

Section 1328(a) makes clear that a debtor who completes his plan payments may not discharge a debt that stems from a civil judgment where damages were assessed against the defendant-debtor for his willful or malicious actions that caused personal injury to an individual or the death of an individual. Section 1328(a) only allows for a determination of nondischargeability when the debt arises out of a debtor's willful or malicious act that causes injury or death to another individual, *not* injury to property, as is the case in this matter.

Paragraph (a) of § 523 states that "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . ." and then enumerates the various categories of debts. 11 U.S.C. § 523(a). Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Section 1328(a)—the completion of plan discharge—is omitted from the language of § 523(a). *Cf. In re Hardenberg*, 42 F.3d 986, 992 (6th Cir. 1994) (holding that state criminal fines are nondischargeable debts in a Chapter 7 case per § 523(a)(7) but state criminal fines are dischargeable in a Chapter 13 case where debtor completes plan payments and is discharged per § 1328(a)).

"[W]here Congress includes particular language in one section of a statute but omits it in another provision of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Soliman v. Gonzales*, 419 F.3d 276, 283 (4th Cir. 2005) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)). The Court presumes that, by excluding § 1328(a) from the enumerated list in § 523(a) of the Code's discharge provisions across various chapters, Congress did so purposefully. Thus, a debt for willful and

21

malicious injury by the debtor to the *property* of another entity *is* dischargeable when a Chapter

13 debtor completes the payments contemplated by his Chapter 13 plan. The Court also

presumes that, by limiting § 1328(a)(4)'s application to willful or malicious injuries that caused

personal injury or death to an individual, Congress acted intentionally when it deemed

dischargeable, upon completion of plan payments, debts arising from willful and malicious

injuries to the property of another entity.

In this matter, if and when Defendant completes all his requisite Chapter 13 plan

payments, then the debt Defendant owes to TFC is dischargeable pursuant to § 1328(a).

Defendant is alleged to have caused a willful or malicious injury to TFC's property—its golf

carts and other collateral. There is no allegation that Defendant willfully or maliciously injured

any individual. The scope of § 1328(a)(4)'s exception to a completion of plan discharge is

narrow, and the allegations in this matter fall outside that scope because they concern only injury

*to personal property.* Therefore, given the exclusion of § 523(a)(6) in § 1328(a)(2) and the

narrow construction of § 1328(a)(4), Plaintiff's § 523(a)(6) claim is inapplicable if and when the

Debtors are discharged pursuant to § 1328(a). *See, e.g., Shawnee v. Hodges (In re Hodges),* 407

B.R. 415, 418-19 (Bankr. D. Kan. 2009) ("Section 523(a)(6) is not incorporated into §

1328(a)(2); thus [plaintiff] fails to state a claim for relief by citing § 523(a)(6).") (internal

footnotes omitted); *see also Parrish v. Parrish (In re Parrish),* APN 08-8014-TJM, 2009 WL

6338568, at \*5 (Bankr. D. Neb. Dec. 1, 2009) (stating that "debts of the type covered by §

523(a)(6) are among those discharged if a debtor completes all payments under the plan").

**b. Determination Of Nondischargeability Pursuant To § 1328(b) Is Not Ripe**

Section 1328(b) allows a court to grant a Chapter 13 debtor a discharge when the debtor

fails to complete all the payments contemplated in a plan confirmed by the court. The debtor

may receive a discharge if, after confirmation of the plan but before completion of all payments,

the debtor fails to complete the plan payments but that failure is

> (1) due to circumstances for which the debtor should not justly be held
> accountable; (2) the value, as of the effective date of the plan, of property actually
> distributed under the plan on account of each allowed unsecured claim is not less
> than the amount that would have been paid on such claim if the estate of the
> debtor had been liquidated under chapter 7 of this title on such date; and (3)
> modification of the plan under section 1329 of this title is not practicable.

11 U.S.C. § 1328(b). In order for a court to grant a debtor a discharge per § 1328(b), the court

*must confirm the debtor's Chapter 13 plan, hold a hearing, and find that each of the three*

elements in § 1328(b)'s subsections is present. *Id.* Section 1328(c) states that "[a] discharge

granted under subsection (b) of this section discharges the debtor from all unsecured debts

provided for by the plan or disallowed under section 502 of this title, except any debt--(1)

provided for under section 1322(b)(5) of this title; or (2) of a kind specified in section 523(a) of

this title." 11 U.S.C. § 1328(c). Section 1322(b)(5) is not applicable in this case. Section

523(a), however, is applicable in this matter.

After a court grants a debtor a discharge per § 1328(b), a party-in-interest may object to

the discharge of a debt on the basis of § 523(a) according to the plain language of § 1328(c).

Notably, there are no constrictions as to which paragraphs of § 523(a) are applicable to a §

1328(b) discharge, in contrast to the restrictions present in § 1328(a)(2) noted above. In order

for § 523(a) to be applicable when a debtor is discharged pursuant to § 1328(b), the statute

requires that, obviously, the debtor be granted a hardship discharge per § 1328(b).

In this case, no party, including the Debtors, has moved for a discharge pursuant to §

1328(b), much less the Court having granted the Debtors a discharge per § 1328(b). Therefore, §

1328(c)'s reference to § 523(a) has no applicability at this stage of the Debtors' Chapter 13 Case,

and thus, Plaintiff cannot rely on § 523(a)(6) as the basis for its complaint seeking

nondischargeability of a debt.

Plaintiff's § 523(a)(6) count is not ripe at this time.  The Debtors filed their Third

Amended Chapter 13 Plan on July 8, 2010 (the "Third Amended Plan").  (Case No. 09-73717-

FJS, Doc. No. 81.)  The Court has not yet entered an Order of Confirmation on the Third

Amended Plan, nor has the Court entered an Order Denying Confirmation of the Third Amended

Plan.  Thus, the without confirmation of the Third Amended Plan, § 1328(b) is inapplicable.  If

the Debtors convert their case to a case under Chapter 7 or if the Debtors seek a hardship

discharge per § 1328(b), then the Court will reconsider Plaintiff's § 523(a)(6) count at that time

and render an appropriate ruling.  *See Eric D. Fein, P.C. & Assoc. v. Young (In re Young)*, 425

B.R. 811, 815 (Bankr. E.D. Tex. 2010) ("[T]he plaintiff's § 523(a)(6) claim is not ripe for

decision because 'resolution of the issue has no meaningful effect until and unless the debtor

moves for hardship discharge, a contingency that occurs only in a small percentage of Chapter 13

cases.") (quoting *Ambassadors Travel Servs. v. Liescheidt (In re Liescheidt)*, 404 B.R. 499, 505

(Bankr. C.D. Ill. 2009)).[8]  Accordingly, the Court dismisses without prejudice Plaintiff's §

523(a)(6) count; only upon the grant of a hardship discharge per § 1328(b) or upon the

conversion of Debtors' case to a case under Chapter 7 will the Court revisit Plaintiff's §

---

[8] Judge Perkins, in *Liescheidt*, explains well the issue before the Court:

> Where a debtor is proceeding toward a full compliance discharge, that would by definition
> discharge a Section 523(a)(6) debt, there is no reason to litigate the issue of whether the debt is, in
> fact, one for a willful and malicious injury.  Whether it is or isn't doesn't matter, since it will be
> discharged either way if the debtor receives a full compliance discharge.  Only if the debtor
> subsequently moves for a hardship discharge, which would not discharge a debt for a willful and
> malicious injury, would it matter.  This principle is embodied in Rule 4007(d), which provides that
> when a debtor files a motion for hardship discharge, the court shall fix a deadline for creditors to
> file complaints under Section 523(a)(6) and provide notice of the deadline to all creditors.

*Liescheidt*, 404 B.R. at 504 (dismissing without prejudice plaintiff's § 523(a)(6) claim for lack of subject matter
jurisdiction).

523(a)(6) count.

## C. Damages

As stated above, the Court will grant Plaintiff's § 523(a)(4) count for fraud or defalcation

in a fiduciary capacity. The Court must determine the measure of damages to be awarded to

Plaintiff. Plaintiff's out-of trust amount is $168,636.00, as represented by Plaintiff's Trial

Exhibit 7. (Pl.'s Tr. Ex. 7.) Plaintiff's Trial Exhibit 7 was admitted into evidence at trial and not

contested by Defendant; in fact, Defendant stipulated to this document before trial. (Trial Tr., at

21:1-8, 27:5-10; Stip. of Facts ¶ 11.)

In *Strack*, the Fourth Circuit stated that the relevant inquiry under § 523(a)(4) must focus

on the "*proceeds* from the sale of the chattel." *In re Strack*, 524 F.3d at 500 (emphasis in

original). The Fourth Circuit stated that an express trust exists where the underlying contract and

trust agreement stated that "if [the debtor] sold a piece of equipment to a third party before it

remitted to [the creditor] the total payment due for that equipment, [the debtor] "*shall segregate

the proceeds [from the sale] and hold the same in trust for [the creditor]*." *Id.* at 499 (emphasis

in original).

Thus—as the language of the underlying documents executed by Plaintiff, Atlantic Golf,

and Defendant resemble those in the *Strack*—the relevant inquiry in this case must focus on the

proceeds that ought to have been remitted to Plaintiff. Here, the Wholesale Security Agreement

states that "Debtor promises to pay to Secured Party the original invoice cost ("Invoice Cost") of

each item of Collateral financed or refinanced for Debtor by Secured Party pursuant to terms

letters, finance plans or otherwise . . . ." (Pl.'s Trial Ex. 2, § 2.) Further, the Wholesale Security

Agreement states that "Debtor may sell any item of Collateral PROVIDED THAT: . . . (c)

Debtor holds all of the proceeds of any such sale in trust for, and promptly remits the unpaid

25

Invoice Cost of such item of Collateral to, Secured Pary." (Pl.'s Trial Ex. 2, § 2.)

The best evidence before the Court as to the amount of damages due to Plaintiff resulting from Defendant's defalcation while acting in a fiduciary capacity is Plaintiff's Trial Exhibit 7, to which Defendant stipulated. (Trial Tr., at 21:1-8, 27:5-10; Stip. of Facts ¶ 11.) The Court finds as a finding of fact that as a result of Defendant breach of his fiduciary duties to Atlantic Golf, and Atlantic Golf's subsequent breach of its fiduciary duties to Plaintiff, Defendant failed to remit to Plaintiff proceeds of sales of collateral in the amount of $168,636.00.

Plaintiff, however, has received partial satisfaction of its debt from Reginald J. Padgett in the amount of $37,500.00. (APN 09-7140-FJS, Pl.'s Trial Ex. 16.) Pursuant to the Settlement Agreement, Padgett paid TFC $37,500.00. In exchange for payment of $37,500.00, TFC assigned to Padgett all rights and remedies of TFC for the enforcement and collection of the amount or amounts paid. (APN 09-07140-FJS, Pl.'s Trial Ex. 16.) As a result of the settlement between Padgett and TFC, TFC has applied a credit in the amount of $37,500 to the State Court Judgment. (APN 09-07140-FJS, Compl. ¶¶ 35-39.) Therefore, Defendant's debt of $131,136.00 shall be deemed nondischargeable.

Finally, Plaintiff and Defendant have each requested attorneys' fees and costs. (Compl. ¶ 70; Answer at 3.) The Court denies Plaintiff's request for attorneys' fees and costs because "neither position taken by the Plaintiff and Defendant was frivolous or without merit." *Reilly v. Beeman (In re Beeman)*, 225 B.R. 522, 529 (Bankr. D. N.H. 1998); *see also Tanner's Transfer & Storage of Va., Inc. v. Florance (In re Tanner's Transfer & Storage of Va., Inc.)*, 39 B.R. 835, 840 (Bankr. E.D. Va. 1984). There is no evidence in the record before the Court that either party or either party's counsel acted in bad faith or took a position that lacked merit or that may be deemed frivolous—in the instant matter or in the State Court Action. As such, each party shall

26

bear its own attorneys' fees and costs.

## IV. CONCLUSION

For the reasons stated above, Plaintiff Textron Financial Corporation's Complaint against

Defendant Charles D. Hadley seeking a determination of nondischargeability as to certain debts

pursuant to 11 U.S.C. § 523(a) is GRANTED IN PART AND DENIED IN PART.  Plaintiff's §

523(a)(4) Count is GRANTED and damages are awarded in the amount of $131,136.00.

Plaintiff's § 523(a)(6) Count is DENIED WITHOUT PREJUDICE.

Upon entry of this Memorandum Opinion, the Clerk of Court is directed to serve via

United States Mail, first class postage prepaid, a copy of this Memorandum Opinion to: Jeffrey

L. Marks, Esq., Kaufman & Canoles, Suite 700, 2101 Parks Avenue, Virginia Beach, Virginia,

23451; Leonard D. Levine, Esq., Childress, Flax, Levine, P.C., 533 Newtown Road, Suite 101,

Virginia Beach, Virginia, 23462; Charles David Hadley, III, 1006 Broward Way, Chesapeake,

Virginia, 23322; Michael P. Cotter, Esq., Chapter 13 Trustee, 870 Greenbrier Circle, Suite 402,

Chesapeake, Virginia, 23320; Reginald J. Padgett, Esq., 1005 Cronin Court, Chesapeake,

Virginia, 23322; James T. Lang, Esq., Pender & Coward, P.C., 222 Central Park Ave., Virginia

Beach, Virginia, 23462; Daniel F. Blanks, Esq., McGuireWoods LLP, 9000 World Trade Center,

101 W. Main St., Norfolk, Virginia, 23510; Erin Quinn Ashcroft, Esq., McGuire Woods LLP,

101 W. Main Street, 9000 World Trade Center, Norfolk, Virginia, 23510.

A SEPARATE ORDER WILL ISSUE.

DATED:

8-19-2011

FRANK J. SANTORO
United States Bankruptcy Judge

NOTICE OF JUDGMENT OR ORDER
Entered on docket.  AUG 1 9 2011